UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TOBY MAKOTO HARUNO,<br><br>    Petitioner,<br><br>v.<br><br>JENNIFER MICHIKO FOWLER HARUNO,<br><br>    Respondent. | Case No. 2:13-cv-01354-APG-PAL<br><br>**ORDER DIRECTING RETURN OF MINOR CHILD TO COUNTRY OF HABITUAL RESIDENCE** |

Petitioner Toby Makoto Haruno ("Toby") has filed this action under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 – 11610. Toby seeks to have his minor child, Jordan Haruno, returned to New Zealand from Las Vegas, Nevada. Toby contends that his wife, Respondent Jennifer Michiko Fowler Haruno ("Jennifer"), is wrongfully keeping Jordan in Nevada without Toby's consent or acquiescence. For the reasons set forth below, Toby's Petition is granted.

I.   **BACKGROUND**

Toby and Jennifer are United States citizens and were married in the United States. They moved from Los Angeles, California to Wellington, New Zealand on approximately June 30, 2008. Although they had one-year visas, they renewed those visas each successive year. Toby was and remains gainfully employed in New Zealand in the animation industry. Although over

the years they discussed ultimately returning to the United States, they never took concrete steps to leave New Zealand.

Jordan was born in Wellington, New Zealand on January 11, 2011. He is a United States citizen. Jordan lived his entire life in New Zealand, until December 8, 2012. On that date, Toby, Jennifer and Jordan took a long vacation trip to North America, having purchased round-trip tickets with a return flight to New Zealand from Vancouver on February 2, 2013. On February 1, 2013, Jennifer changed her flight arrangements so that, instead of returning to New Zealand, she and Jordan flew from Vancouver to Las Vegas, Nevada, where her parents live. There is conflicting testimony about whether and to what extent Toby protested this change, but he did not prevent them from going to Las Vegas, and he helped them check in their luggage for the flight. Toby returned to New Zealand alone.

After returning to New Zealand, Toby made repeated efforts to convince Jennifer to return to New Zealand. He continued to financially support Jennifer and Jordan in Las Vegas, and kept in regular contact with them via video and telephone connections. A few months later, Toby visited them in Las Vegas and discovered that Jennifer had contacted a lawyer in Las Vegas to obtain a divorce. Toby returned to New Zealand, contacted legal counsel, and initiated this proceeding. In the meantime, Jennifer filed a divorce proceeding in Las Vegas.

On October 1, 2013, the Court conducted an evidentiary hearing on Toby's Petition. On October 11, the parties filed post-hearing briefs.

**II.    ANALYSIS**

It is not for this Court to determine who is the better parent, which country is a better place to raise the child, or who should be awarded custody of Jordan. The Hague Convention articles, rules and exceptions are "not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996). *See also Walsh v. Walsh*, 221 F.3d 204, 218-19 (1st Cir. 2000)("Courts are not to engage in a custody determination, so '[i]t is not relevant ... who is the better parent in the long run, or

whether [the absconding parent] had good reason to leave her home ... and terminate her marriage.'")(citations omitted).  Rather, the fundamental premise of the Hague Convention is that courts of the child's habitual residence should decide custody issues because they are presumptively better situated to make custody decisions.  *Friedrich*, 78 F.3d at 1068 ("And if Germany really is a poor place for young Thomas to grow up, as Mrs. Friedrich contends, we can expect the German courts to recognize that and award her custody in America.  When we trust the court system in the abducted-from country, the vast majority of claims of harm-those that do not rise to the level of gravity required by the Convention-evaporate.").  Indeed, the appropriate New Zealand authorities may determine that it is best for the child to be returned to Jennifer's custody, in New Zealand or the United States.

This Court's focus is more narrow:

> A court [determining whether a child was wrongfully removed must] answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

**A. When did the removal or retention at issue take place?**

It is unclear what specific date the removal or retention took place.  Rather, it appears to have evolved over the period February through June of 2013.  The parties left New Zealand on December 8, 2012, with return tickets for February 2, 2013.  On February 1, 2013, Jennifer changed her and Jordan's tickets and instead flew to Las Vegas, where they have remained. During the October 1, 2013 hearing, Jennifer was equivocal about when she decided to permanently remain in Las Vegas.  She testified at one point that she made the decision shortly after returning to Las Vegas from Vancouver.  However, in her Answer to the Complaint, she claims that she "was trying to decide what to do with her life while staying with her family in Las Vegas." [Dkt. #12 at 7:14-16.]  Later, she allowed Toby to buy her and Jordan tickets to return to New Zealand on April 13, 2013, only to cancel those after injuring herself the day before the

flight. She testified at the hearing that when Toby visited them in June 2013, there was a possibility they would all return to New Zealand "if things improved." She further testified that she never told Toby that she would not return to New Zealand. Finally, the evidence at the hearing indicated that Jennifer was trying to stall her and Jordan's return for more than six months, so that the Nevada courts would have jurisdiction over the custody issues.

### B. Where was the child habitually resident immediately before removal?

The Hague Convention does not define the term "habitual residence." "[T]this has been a matter of deliberate policy, the aim being to leave the notion free from technical rules which can produce rigidity and inconsistencies as between different legal systems." J.H.C. Morris, Dicey and Morris on the Conflict of Laws 144 (10th ed. 1980) (quoted in *Mozes*, 239 F.3d at 1071). The issue is necessarily fact-intensive. In the present case, nearly all of the relevant factors point to New Zealand as the child's habitual residence.

Toby and Jennifer lived in New Zealand for over four and one-half years. Although they had one-year work visas as allowed by New Zealand law, they repeatedly renewed them. The child was born in New Zealand and lived there for nearly two years. He was active in playgroups there. Jennifer testified that before they left on vacation in late 2012, they were investigating preschools in New Zealand.

At various times during their marriage, Toby and Jennifer discussed eventually returning to the United States, but took no concrete steps to accomplish that. Such discussions do not overcome the other factors indicating the child was a habitual resident of New Zealand before removal. "Being habitually resident in a place must mean that you are, in some sense, 'settled' there -- but it need not mean that's where you plan to leave your bones. Nor could we justify limiting habitual residence to persons who settle in an area for some particular motive." *Mozes*, 239 F.3d at 1074. For the foregoing reasons, the evidence is overwhelming that New Zealand was the child's habitual residence before he was retained in the United States.

### C. Did the removal or retention breach Toby's custody rights under New Zealand law?

Under New Zealand law, as a married father living with the child's mother, Toby had joint guardianship and custody of the child prior to Jennifer's retaining him in the United States. Toby lived with the child since his birth, Toby never waived any of his parental rights, and no court order or other agreement has been presented modifying Toby's rights. Jennifer's retention of the child in the United States interferes with Toby's custodial rights.

### D. Was Toby exercising those rights at the time of the removal or retention?

Jennifer claims that Toby worked excessive hours at his job, did not regularly participate in activities with the child, and thus was not exercising his rights. The evidence presented at the hearing proved that Toby was exercising his parental rights. Even though Toby may have worked long hours, he still interacted with the child, went to play groups with him, was involved in his life, and contributed to his care and upbringing until Jennifer retained him in the United States. Toby was exercising his parental and custodial rights.

Based on the foregoing, Toby has proven a cause of action for the return of the child to New Zealand.

### E. Exceptions to the Hague Convention Articles Requiring the Child's Return.

Jennifer has attempted to defend against the child's return to New Zealand by alleging that (a) Toby consented to or acquiesced in the child's remaining in the United States, and (b) returning the child presents a grave risk to his physical and emotional health. Jennifer has the burden of proving these two defenses, which arise under Article 13 of the Hague Convention. *See* Hague Convention Article 13 (court "is not bound to order the return of the child if the person, institution or other body which opposes its return establishes" the exceptions); *Danaipour v. McLarey*, 386 F.3d 289, 296 (1st Cir. 2004)("The party opposing return of the children . . . has the burden of proving the ultimate Article 13(b) exception issue by clear and convincing evidence.")(citation omitted). Jennifer has not met that burden.

### 1. Consent/Acquiescence.

Jennifer contends that Toby consented to allowing her to take the child to the United States. She claims he did not protest when she changed their flight from Vancouver to Las Vegas, and that he helped them check in their bags at the airport. Even if true, such actions do not constitute consent to allow the child to permanently remain in the United States. Had Toby tried to physically force Jennifer to return to New Zealand from Vancouver, he might have been charged with kidnapping and/or domestic violence. Had Toby not helped them at the airport, Jennifer no doubt would argue that this showed he was not a good "family man."

Most importantly, Toby's actions thereafter prove that he did not consent to the permanent relocation of the child. Toby remained in regular contact with Jennifer and the child (through both video and telephone), and continually tried to convince them to return to New Zealand. He purchased return flight tickets for them (which Jennifer ultimately canceled after coincidentally becoming injured the day before the flight). He traveled to Las Vegas to convince them to return. The evidence clearly refutes any argument that Toby consented to or acquiesced in allowing the child to permanently remain in the United States.

### 2. Grave Danger to the Child.

Jennifer next contends that the child would face grave risk of physical and emotional injury if he is returned to New Zealand. In support of that allegation, she points out that Toby was arrested and charged with domestic violence against Jennifer over two years before the child was born. Those charges were later dropped after Jennifer hired a lawyer to help her recant her allegations. Even if the allegations were true, they do not constitute a grave threat to the child. The injury occurred to Jennifer, and there were no reports of violence in the years thereafter. While Jennifer accuses Toby of having a bad temper and being prone to angry outbursts, the evidence indicates that at most only once was it directed towards the child. The only episode involving the child occurred when Toby allegedly shook him once after becoming frustrated at having difficulty putting on his diaper. While this is not to be condoned, it apparently was not a "grave" event, as a few hours later Jennifer left the child in Toby's care so she could go out and

party with her friends. Moreover, a single episode such as this does not constitute a grave threat of future violence to the child.

> The text of [Article 13] requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. *See Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir.1995). Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. *See* Hague Convention, art. 1. For example, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another"; otherwise, the goals of the Convention could be easily circumvented.

*Walsh v. Walsh*, 221 F.3d 204, 218-19 (1st Cir. 2000)(citations omitted). In her brief, Jennifer claims that the child has bonded with her, and it would be psychologically damaging to the child to remove him from her daily custody. However, she has presented no expert or other evidentiary support for this allegation.

Finally, Jennifer has not shown that the courts in New Zealand cannot or will not protect the child. *See Friedrich*, 78 F.3d at 1069 ("[T]here is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."); *Walsh*, 221 F.3d at 221 ("Courts, when confronted with a grave risk of physical harm, have allowed the return of a child to the country of habitual residence, provided sufficient protection was afforded.")(citations omitted). Jennifer admitted at the hearing that in New Zealand, "they take domestic violence very seriously, and there are laws set up to protect victims." That was proven when Toby was arrested for domestic violence against Jennifer, and she had significant difficulty trying to recant her allegations. *See also*, New Zealand Care of Children Act, sections 4 and 5 (cited in Toby's Hearing Exhibit 48). It appears that the New Zealand legal system offers sufficient help and protection for the child,

if needed. Jennifer has not met her burden of showing that returning the child to New Zealand will present a grave threat of physical or emotional harm to the child.

### III. CONCLUSION

IT IS THEREFORE ORDERED AS FOLLOWS:

Pursuant to the provisions of The Convention on the Civil Aspects of International Child Abduction, done at The Hague on 25 Oct 1980 and/or the International Child Abduction Remedies Act, 42 U.S.C. 11601 et seq., JORDAN HARUNO (born January 11, 2011) shall be returned in the company of his father to the sovereign nation of New Zealand. Jennifer may accompany them to New Zealand but is not required to. Unless the parties come to some other agreement, the child shall be returned to New Zealand within 14 calendar days of this Order. The father shall report the return of the child to the appropriate Central Authority under the Hague Convention in New Zealand within 10 calendar days of their arrival.

The parties are strongly encouraged to work out a visitation schedule with the child in the short term (i.e., before his return to New Zealand), and for the time thereafter until the New Zealand authorities can issue a custody order. The parties also are strongly encouraged to reasonably arrange the date and time of departure from the United States. In the absence of any written agreement between Toby and Jennifer, by virtue of this Order, TOBY MAKOTO HARUNO has the exclusive right to the physical and legal custody of the child during the period of time required to return the child to New Zealand, the country of the child's habitual residence.

This order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Convention. Indeed, the appropriate authorities in New Zealand may determine that it is best for the minor to be returned to the custody of Jennifer in New Zealand or the United States.

The order of this court is made under the authority of U.S.C. 11603(a), conferring upon this court concurrent original jurisdiction with the State courts of the United States.

NOW THEREFORE, TO ANY PEACE OFFICER IN THE STATE OF NEVADA, AND TO ANY FEDERAL OFFICER:

YOU ARE HEREBY COMMANDED TO enforce the instant order allowing TOBY MAKOTO HARUNO to remove the above-named child from the United States of America to the country of New Zealand, giving said TOBY MAKOTO HARUNO the right, without interference, to have said child in his lawful custody for the purposes described herein.

This order is effective as of the date written below, and shall continue in force and effect until modified or cancelled by this Court or a court of competent jurisdiction in New Zealand.

DATED THIS 16th day of October, 2013.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE